**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Luis GUTIERREZ, Defendant–
Appellant.**

**No. 02–2434.**

United States Court of Appeals,
Seventh Circuit.

Argued June 5, 2003.

Decided June 14, 2004.

William J. Lipscomb, Michelle L. Jacobs, Milwaukee, WI, for Plaintiff–Appellee.

Paul Flynn, Rockford, IL, for Defendant–Appellant.

Before FLAUM, Chief Judge, COFFEY, Circuit Judge and MANION, Circuit Judge.

## ORDER

On February 13, 2002, Luis Gutierrez was found guilty by a jury of one count of conspiracy to possess with intent to distribute cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 846. In response to a special verdict question, the jury further concluded that the drug conspiracy of which Gutierrez was a part involved more than five kilograms of cocaine. During a separate sentencing hearing held on May 16, 2002, the trial court sentenced Gutierrez to 121 months in prison. On appeal, Gutierrez argues for reversal of his conviction on the basis that the trial court erred insofar as it failed to instruct the jury to determine the amount of cocaine individually attributable to Gutierrez. We affirm.

### I. Background

Between January of 1999 and June of 2000, Defendant Luis Gutierrez[1] ("Luis" or "Gutierrez") was indicted, along with 19 other individuals, and charged with conspiring to distribute five or more kilograms of cocaine in Green Bay, Wisconsin. On February 4, 2002, the charges against Luis proceeded to trial.

At trial, the jury heard evidence that Luis participated in the conspiracy to distribute cocaine operating between Green Bay, Wisconsin, and Los Angeles, California. The drug ring was run by a man named Pedro Perez. Most members of the ring resided in Green Bay, obtained cocaine from other drug-ring members living in Los Angeles, and re-distributed the drugs in Green Bay.

Detective Dean Pattison of the Boone County, Ohio, Sheriff's Department, who was at the time assigned to a Drug Enforcement Administration ("DEA") drug task force working out of the Cincinnati International Airport, testified that on April 16, 1999, he stopped one of the drug ring's carriers, Ana Enriquez, for questioning at the airport while Enriquez was on her way from Los Angeles to Green Bay. (Tr. I at 106–110). During questioning, Enriquez consented to a search of her luggage and upon searching her luggage, Drug Enforcement Administration ("DEA") officers discovered four white cream jars containing approximately 1.02 kilograms of cocaine. (Tr. I at 130–34.). The DEA officers arrested Enriquez for possession with intent to distribute cocaine. Enriquez decided to cooperate with the DEA, and provided important information about Perez's drug ring enabling the officers, after receiving court authority, to monitor phone calls, obtain travel records, and videotape interactions between several of the drug ring's runners and distributors-including Luis Gutierrez. (*Id.* at 130.)

Julio Garcia, a member of Perez's drug ring who distributed cocaine in Green Bay, also testified at Gutierrez's trial and provided first-hand information regarding the workings of the drug ring. He stated that between May of 1999 and June of 2000, he received approximately one "ounce [or] two ounces [of cocaine] a week" from Perez's carriers. (Tr. III at 527.) As far as the source of drugs distributed by the drug ring to its customers in Green Bay, Garcia claimed that in the year 2000 the drug ring's runners transported cocaine from Los Angeles to Green Bay "at least once a month, sometimes even two [times] a month." (*Id.* at 548.) Furthermore, Garcia estimated[2] that each load of co-

---

1. This appeal was originally consolidated with Nos. 01–4003, 02–1337, & 02–2389. Those appeals (filed by three of Gutierrez's co-defendants) have been subsequently dismissed under Fed. R.App. P. 42(b). Thus we consider only this appeal by Gutierrez.

2. Garcia stated that he received and distributed about 25% of the cocaine that was trans-

caine arriving in Green Bay was "at least a kilo," and that between the beginning of 1999 and June of 2000 alone, he had received "somewhere between five to ten kilos" of cocaine from Perez's drug ring. (*Id.* at 548–49.)

DEA Agent Bernard Bolf corroborated Garcia's testimony, stating that, during an interview with DEA agents, Garcia admitted that he worked with Perez to distribute the drug ring's cocaine for resale. Bolf further recounted Garcia's confession that he sold cocaine obtained from Perez's drug ring on a weekly basis, in quantities of approximately "a half an ounce to an ounce." (Tr. II at 203.)

Alfredo Lopez, another Green Bay "distributor" working for Perez's drug ring, testified that he "knew [the cocaine he distributed] came from California," (Tr. III at 674), and that Luis Gutierrez often transported the drugs from California to Green Bay. Specifically, he claimed that Perez was "always saying [to him] that [Luis Gutierrez] was going to California" to pick up drugs. (*Id.* at 675.) According to Lopez, Gutierrez delivered cocaine to him in "lotion jars" stored in a "handheld suitcase" with wheels that were most often black. (Tr. III at 678, Tr. IV at 724.) As far as the *amount* of cocaine he received, Lopez testified that Gutierrez delivered "between a kilogram and a kilogram and a half" of cocaine to him on each of three or

four different occasions during a six-month period. (Tr. III at 680.)

Several of the detectives and drug officers involved in the surveillance of Perez's drug ring offered corroborating evidence regarding Gutierrez's participation in the drug ring. Detective Daniel Bennington testified that, on May 25, 2000, he and other officers videotaped a Hispanic male "exiting [a Greyhound] bus station and walking towards a taxicab," and "pulling a black luggage bag." (Tr. III at 649.) Thereafter, another officer, Jeffrey Nett, followed the taxicab from the Greyhound station to 1360 Chicago Street–Gutierrez's residence.

Less than three weeks later, on June 16, 2000, agent Bradley Dunlap and other officers videotaped the same Hispanic man getting in to a taxicab at the Greyhound bus station. Thereafter, officer David Van Erem followed the taxicab to 1360 Chicago street, where the man got out and "carr[ied][the] black rolling suitcase" inside the residence. (Tr. IV at 924–25.) Officers testified that they were alerted to the need for surveillance at the Greyhound bus station based on information they received after listening to taped phone conversations,[3] that "a male Hispanic" would be arriving at the station sometime after 11 pm "c[a]rrying a load of cocaine." (Tr. IV at 808, Tr. V at 967–68, 970–71.) At trial, the officers positively identified Gu-

---

ported to Green Bay from California, (Tr. Ill at 548), a percentage which amounted to between two to four ounces of cocaine a week (224 to 448 grams), (Tr. III at 560). Thus, based on Garcia's figures, the drug ring was transporting between 1 and 2 kilos of cocaine to Green Bay each month.

3. Both on May 25 and June 16, the Green Bay agents had received information at a morning "debriefing [session] before [thei]r shift that there w[ould] be ... a Greyhound bus coming in with an individual that would have cocaine that was to be delivered to ... one of the

houses in Green Bay...." (Tr. IV at 827) (Agent Bradley Dunlap, discussing the June 16 observation of Gutierrez); (*see also* Tr. V at 967) (Agent Thomas Sturdivant, discussing the May 25 surveillance). The agents did not specify which individuals had provided the information regarding Gutierrez's drug-trafficking activities, but did testify that "the information ... came from the listening post" (Tr. V at 967)-*i.e.*, a wiretap set up so that agents could "listen[ ] to the phone conversations ... going back and forth between different individuals" in the drug ring. (*Id.*)

tierrez as the man they had observed exiting the bus station on both occasions. (Tr. IV at 829–32, Tr. V at 972–73.)

Jessica Laux, Gutierrez's former girlfriend, also testified, recounting that Gutierrez disappeared quite often and would not tell her where he was going. (Tr. V at 928.) She further testified that Gutierrez had, on two occasions, requested that she join him on a trip to California to "help him with some special lotion." (*Id.* at 933.) Laux stated that, whenever Gutierrez traveled, he carried a black suitcase containing "some kind of lotion." (*Id.* at 933.) This testimony corroborated Lopez's prior testimony that Gutierrez transported cocaine in "lotion jars" contained in a black "handheld suitcase." (Tr. III at 678, Tr. IV at 724.)

Investigators recorded approximately 256 telephone conversations between Perez and other drug-ring members, many of which were received in evidence at trial and supported Lopez's testimony that Gutierrez was the primary cocaine transporter for the ring. Various recordings captured conversations between drug-ring members that set forth Gutierrez's responsibilities as a drug carrier for the group, his frequent trips from Green Bay to Los Angeles, as well as specific amounts of cocaine that Gutierrez was to transport during the year 2000.[4] (Tr. II at 226, Tr. IV at 720, 730–47.) In one conversation between Lopez and Garcia, the two men discussed the arrival of a load of cocaine that Gutierrez had delivered to Lopez. (*Id.* at 724.) In another phone conversation recorded on May 24, 2000, Perez disclosed that Gutierrez would be transporting "approximately two kilograms" of cocaine from Los Angeles to Green Bay. (Tr. IV at 746–47.)

Prosecutors also submitted flight itineraries, receipts, baggage tickets, and electronic boarding passes recovered from Gutierrez's home, which further served to establish that Gutierrez made frequent drug runs to and from Los Angeles. These tickets and receipts documented 14 short "turnaround" trips between Green Bay and Los Angeles taken by Gutierrez during an eleven-month period (July 24, 1999 to June 14, 2000). (Tr. IV at 818–25, Tr. VI at 1038–39.) Greyhound bus receipts documented Gutierrez's travel between O'Hare International Airport in Chicago and Milwaukee, and Milwaukee and Green Bay-each imprinted with one of the dates upon which Gutierrez returned to Chicago from Los Angeles. (Tr. VI at 1039–40.) In fact, one receipt was for travel from Chicago to Green Bay on June 16, 2000 (*id.*)-the same day that agents in Green Bay were informed a cocaine load would arrive via a carrier at the Greyhound bus station and on which day agents in fact observed Gutierrez leaving the Greyhound station with a black suitcase (Tr. III at 649.)

Detective Pattison and Detective Guy Engelbert both testified to the jury that short "turnaround" trips of the type frequently taken by Gutierrez are monitored

---

4. Agent Bolf, the DEA officer who oversaw wiretapping procedures that monitored correspondences between Perez's drug-ring members, testified that members of the ring did not actually use the term "cocaine" when referring to the drugs they were dealing. Instead, DEA agents concluded from the wealth of conversations they had recovered that Perez's workers used code words such as "shirts," "buttons," "girls," "tickets," and "oranges" to represent "cocaine." (Tr. I at 170–71.) Julio Garcia, one of Perez's drug dealers, corroborated the agents' conclusion that these code words stood for "cocaine," testifying that when corresponding with members of the drug ring, he often used words such as "girls" and "tickets" to refer to the cocaine that came from California. (Tr. III 534.)

by drug task force officers because they are considered "suspicious flight itineraries"-especially when such trips originate (as did Gutierrez's trips) in "drug source cities" such as Los Angeles, and end in more "eastern" cities such as Green Bay. (Tr. I at 108, 126.) The detectives explained that these "turnaround" trips are more suspicious when the tickets for such trips are purchased immediately preceding the trip (*i.e.*, a day or two in advance), with cash, or for brief periods of stay (two to five days between departure and return). (Tr. I at 108, Tr. II at 212.)

After a seven-day trial, the jury found Gutierrez guilty of conspiracy to possess with intent to distribute cocaine. Over Gutierrez's objection, the court instructed the jury to determine whether the *whole conspiracy* involved five or more kilograms of cocaine (rather than instructing the jury to determine the amount individually attributable to Gutierrez). In response to this interrogatory, the jury concluded that the conspiracy of which Gutierrez was a part *did* involve five or more kilograms of cocaine. On May 16, 2002, Gutierrez was sentenced to 121 months in prison.

## II. Analysis

■ On appeal, Gutierrez argues that the trial court erred in instructing the jury to determine the amount of cocaine attributable to the conspiracy as a whole, rather than the specific amount attributable to Gutierrez in particular. This Court reviews the district court's jury instructions for an abuse of discretion. *United States v. Hendricks*, 319 F.3d 993, 1004 (7th Cir. 2003). In performing such review, we look at "the charge in its entirety to examine whether the jury was misled in any way and whether it had an understanding of the issues and its duty to determine those issues." *United States v. Renner*, 238 F.3d 810, 812 (7th Cir.2001). " 'So long as

the instructions treat the issues fairly and accurately, they will not be disturbed on appeal.' " *United States v. Knight*, 342 F.3d 697, 709 (7th Cir.2003).

Gutierrez claims that, by failing to instruct the jury to ascertain the amount of cocaine specifically attributable to him, the court "improperly shifted the [Government's] burden ... to establish beyond a reasonable doubt [that Gutierrez] engag[ed] in a conspiracy to distribute in excess of five kilograms of cocaine." Gutierrez's Br. at 6. Gutierrez argues that the trial court's jury instructions thus violated the Supreme Court's holding in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). *Id.* at 6, 8.

*Apprendi* holds that "any fact [other than the fact of a prior conviction] that increases the penalty for a crime beyond the statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490, 120 S.Ct. at 2362–63. Additionally, "[i]n cases involving drugs and alleged violations of 21 U.S.C. §§ 841 and 846, like the one now before us, we have held that 'before a defendant can be sentenced to a term of imprisonment above the default statutory maximum provided in § 841(b)(1)(C) or (D), *Apprendi* requires that a drug type and amount sufficient to trigger the higher statutory maximums of § 841(b)(1)(A) or (B) be charged in the indictment and found by the jury.' " *United States v. Jones*, 245 F.3d 645, 648 (7th Cir.2001).

In this case, the indictment specifically charged the amount of drugs that Gutierrez and his fellow co-conspirators conspired to distribute. Specifically, the indictment charged that Gutierrez "did knowingly and intentionally conspire with [his co-conspirators] ... to possess with the intent to distribute ... in excess of five kilograms of cocaine...." Indictment at 2. Furthermore, at trial, the district

court employed this Court's pattern jury instructions for conspiracy violations, and instructed the jury to determine whether: (1) a drug conspiracy existed, and (2) whether Gutierrez knowingly and intentionally joined the conspiracy to distribute a "measurable" amount of cocaine. (Tr. VI at 1226, 1229.) Additionally, as far as the amount of cocaine was concerned, the jury answered a special interrogatory and concluded that "the offense charged in Count 1 [conspiracy] involve[d] 5 kilograms or more of cocaine." (Tr. VII at 1243.)

Gutierrez's only complaint with regards to the court's jury instructions is that *Apprendi* requires a *defendant-specific* finding regarding drug quantity and type, and in this case the court did not require the jury to determine the amount of drugs specifically attributable to Gutierrez. However, this Court recently held in *Knight,* 342 F.3d 697, that *Apprendi* does *not* require such a defendant-specific finding insofar as drug quantity is concerned. Indeed, we concluded that "[o]nce the jury determines the existence of the conspiracy, the defendants' participation in it, [as well as] the type and quantity [of drugs] attributable to the conspiracy as a whole," the jury "has established the statutory maximum sentence that any one participant in that conspiracy may receive," and the requirement of *Apprendi* is satisfied. *Id.* at 711. Moreover, "[o]nce that maximum sentence has been established (ceiling), the judge may determine the drug quantity attributable to each defendant (floor) and sentence him accordingly." *Id.* In other words, a jury instruction in a Section 841 drug conspiracy case is proper under *Apprendi* so long as it requires the jury to "determine[] whether each defendant was guilty of participating in the conspiracy and then determine[] that the conspiracy involved a type and quantity of drugs suffi-

cient to trigger the [particular] statutory maximum...." *Id.* at 712.

In this case, pursuant to the court's jury instructions, the jury did determine the existence of the conspiracy, and found that Gutierrez was guilty of knowingly participating in that conspiracy. Furthermore, in response to the special interrogatory, the jury determined both the type and amount of drugs used in the conspiracy, concluding that the conspiracy involved in excess of five kilograms of cocaine. Thus, following this Court's recent holding in *Knight,* the jury instructions delivered by the trial court were entirely proper.

Gutierrez's *Apprendi* claim fails for the additional reason that he was sentenced *below* the unenhanced statutory maximum for the conspiracy crime for which he was convicted. It is well-settled that *Apprendi* is inapplicable when a defendant's sentence falls within the statutory maximum prescribed. *United States v. Hernandez,* 330 F.3d 964, 980 (7th Cir. 2003), *United States v. Jones,* 245 F.3d 645, 650 (7th Cir.2001) ("[w]hen a defendant's sentence does not exceed the lowest, unenhanced statutory maximum for the crime for which he was convicted .... there is no *Apprendi*" issue). In this case, 21 U.S.C. § 841(b)(1)(C) provides that the maximum statutory penalty for Gutierrez's involvement in the underlying drug conspiracy was 20 years, or 140 months-regardless of the amount of cocaine involved in the conspiracy. Because the district court sentenced Gutierrez to 121 months, well below the statutory maximum of 140 months, Gutierrez's *Apprendi* claim has no merit.

AFFIRMED.