# United States Court of Appeals
## For the First Circuit

No. 02-1466

UNITED STATES OF AMERICA,

Appellee,

v.

JULIO PEREZ-RUIZ,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. José Antonio Fusté,  U.S. District Judge]

Before

Boudin, Chief Judge,
Selya, Circuit Judge,
and Siler,* Senior Circuit Judge.

Bruce J. McGiverin, by appointment of the court, with whom Julio Pérez-Ruiz, pro se, was on brief, for appellant.
Thomas F. Klumper, Assistant United States Attorney, with whom H. S. Garcia, United States Attorney, and Sonia I. Torres, Chief, Criminal Division, were on brief, for appellee.

December 19, 2003

_____

*Of the Sixth Circuit, sitting by designation.

**SELYA**, **Circuit Judge**. Defendant-appellant Julio Pérez-Ruiz, sometimes known by the sobriquet "Goyito," asks us to reverse his conviction for conspiracy to distribute narcotics or, in the alternative, to vacate his sentence. Although we discern no reversible error with regard to the conviction, we conclude that the district court sentenced the appellant to life imprisonment in violation of the rule announced in Apprendi v. New Jersey, 530 U.S. 466 (2000). Because we cannot classify that error as harmless beyond a reasonable doubt, we vacate the sentence and remand for resentencing.

## I. BACKGROUND

This appeal challenges a myriad of rulings. Accordingly, we offer a balanced account of the overall facts, consistent with record support. United States v. Piper, 298 F.3d 47, 50 (1st Cir. 2002). We recount further facts relevant to particular claims in later sections of this opinion.

On June 29, 2000, a federal grand jury returned a superseding indictment against several persons. The indictment charged the appellant, inter alios, with participating in a long-running conspiracy to distribute multi-kilogram quantities of controlled substances. See 21 U.S.C. §§ 841(a)(1), 846. After much procedural skirmishing (the details of which need not concern us), the case went to trial.

Based on the trial testimony, the jury plausibly could have found that the appellant controlled a drug point in the Caracolas ward of Peñuelas, Puerto Rico. Witnesses testified that the appellant received narcotics from Francisco Zaeton-Pabon (known as "Paquito") and employed others to help him peddle the contraband at the drug point. The government presented evidence that the drug point was part of a larger drug-trafficking empire presided over by Miguel A. O'Connor-Colon (known as "La Cabra") and that La Cabra's organization dealt in a variety of controlled substances (including heroin, powdered cocaine, and crack cocaine). The government also presented evidence that the appellant participated in the murder of Saul Perez, an apostate drug dealer who had broken with La Cabra.

In due course, the jury found the appellant guilty of participating in the larger drug-trafficking conspiracy. The district court sentenced him to life imprisonment. This timely appeal ensued. In it, the appellant presses a salmagundi of arguments. Most of them — dealing with subjects as diverse as prejudicial variance, delayed discovery, improper vouching, and erroneous evidentiary rulings — need not detain us. We dispose of those flawed challenges in decurtate fashion and then focus our attention on the appellant's more substantial arguments: (i) his claim that a government agent improperly bolstered the testimony of a key cooperating witness, and (ii) his claim of Apprendi error.

## II. PREJUDICIAL VARIANCE

Although the appellant concedes that the jury instructions were proper and that the evidence, taken in the light most favorable to the government, permits a finding that he operated and controlled the Caracolas drug point, he insists that the evidence does not suffice to ground a finding, beyond a reasonable doubt, that this drug point was part of La Cabra's empire. On this basis, he argues that a material variance existed between the crime charged in the indictment (participating in La Cabra's master conspiracy) and the crime that the government actually succeeded in proving (participating in a more modest conspiracy). This claim requires us to determine whether a variance occurred and, if so, whether that variance prejudiced the appellant's substantial rights. See United States v. Arcadipane, 41 F.3d 1, 6 (1st Cir. 1994); United States v. Khoury, 901 F.2d 948, 956 (11th Cir. 1990).

When, as now, a defendant asserts a claim of variance premised on the notion that multiple conspiracies existed and that his activities were not part of the charged conspiracy, the initial question — and the only one that we need to reach here — is one of evidentiary sufficiency. United States v. Wihbey, 75 F.3d 761, 773-74 (1st Cir. 1996). In conducting our review, we employ the same framework that we employ in connection with other sufficiency challenges in criminal cases: we "canvass the evidence (direct and

-4-

circumstantial) in the light most agreeable to the prosecution and decide whether that evidence, including all plausible inferences extractable therefrom, enables a rational factfinder to conclude beyond a reasonable doubt that the defendant committed the charged crime." United States v. Noah, 130 F.3d 490, 494 (1st Cir. 1997). Credibility issues must be resolved in favor of the verdict. See United States v. Alicea, 205 F.3d 480, 483 (1st Cir. 2000). We must reject the appellant's claim as long as a plausible reading of the record supports the jury's implied finding that he knowingly participated in the charged conspiracy. United States v. Sepulveda, 15 F.3d 1161, 1173 (1st Cir. 1993).

Courts typically look to the totality of the circumstances in determining whether the proof suffices to establish a single, overarching conspiracy. Relevant factors may include such things as "(1) the existence of a common purpose, such as selling drugs for profit, (2) the interdependency of various elements in the plan, such as whether the success of an individual's own drug transactions depends on the health and success of the drug trafficking network that supplies him, and (3) the degree of overlap among the participants." United States v. Soto-Beníquez, ___ F.3d ___, ___ (1st Cir. 2003) [No. 01-1619, slip op. at 18-19].

There is no cognizable variance here. The jury heard evidence that the appellant controlled the Caracolas drug point;

that the drug point was located at the epicenter of La Cabra's sphere of influence; that Paquito (La Cabra's triggerman and a self-confessed member of the master conspiracy) supplied the appellant with narcotics; that the appellant accompanied Paquito during the assassination of Saul Perez (a murder committed to further the interests of the master conspiracy); and that the appellant frequently interacted with other members of La Cabra's team. At the very least, this evidence permitted a rational inference that the appellant's drug point was part and parcel of the master conspiracy. See United States v. LiCausi, 167 F.3d 36, 45 (1st Cir. 1999) ("Whether a single conspiracy or a multiple conspiracy exists is, of course, a question of fact for the jury."); see generally United States v. Lara, 181 F.3d 183, 204 (1st Cir. 1999) (stating that "[j]urors are entitled to draw reasonable inferences from proven facts"). Consequently, we hold that the jury reasonably could have concluded that the appellant and La Cabra shared a common purpose; that their operations had the requisite degree of interdependency; and that, therefore, the appellant's operation was a subset of La Cabra's master conspiracy. There was no variance.

## III. FAILURE TO GRANT A CONTINUANCE

The appellant's claim that the lower court erred in declining to grant a continuance after the delayed disclosure of Brady/Giglio material is easily dispatched. The facts are as

follows.  The government's star witness, Joelle Irizarry, had been treated in the past at a Puerto Rican prison hospital.  Apparently, the government had obtained Irizarry's prison medical records and disclosed them to a different defendant in a different case in which Irizarry was to appear as a witness.  One of the lawyers in that case furnished a copy of the records to the appellant's attorney after the appellant's trial was under way.  During the defense case, the attorney called the district court's attention to the records and claimed that the prosecution had intentionally withheld the mental health information contained therein.  This improper withholding, the attorney alleged, abridged the appellant's constitutional rights.  See Brady v. Maryland, 373 U.S. 83, 87 (1963) (holding that the prosecution violates due process when it suppresses material evidence favorable to the accused); see also Giglio v. United States, 405 U.S. 150, 154 (1972) (concluding that the nondisclosure of impeachment information falls within the Brady rubric).

Defense counsel requested additional time to inspect the records.  Noting that they had been in counsel's possession for at least thirty-six hours, the district court denied the request.  The court did, however, offer to allow the appellant to recall Irizarry for further cross-examination.  The appellant eschewed that opportunity.

-7-

We review the district court's decision to deny a continuance for abuse of discretion. See United States v. Saccoccia, 58 F.3d 754, 770 (1st Cir. 1995); United States v. Devin, 918 F.2d 280, 289 (1st Cir. 1990). We are satisfied that no such abuse occurred in this case.

When Brady or Giglio material surfaces belatedly, "the critical inquiry is not why disclosure was delayed but whether the tardiness prevented defense counsel from employing the material to good effect." Devin, 918 F.2d at 290. According to the appellant, the delayed disclosure here, coupled with the trial court's refusal to grant a continuance, prevented him from pursuing a strategy to "explore, through cross examination or expert testimony, whether Irizarry suffered from delusions or some mental condition that impaired his credibility or ability to perceive and recall events." Appellant's Br. at 38. There are several reasons why we deem this argument unpersuasive.

In the first place, some showing of prejudice beyond mere assertion is required in the delayed disclosure context. United States v. Smith, 292 F.3d 90, 103 (1st Cir. 2002); United States v. Walsh, 75 F.3d 1, 8 (1st Cir. 1996). The appellant has made none (and, thus, has failed to demonstrate that either the delayed receipt of the records or the court's insistence on going forward foreclosed a viable strategic option).

In the second place, a delayed disclosure only leads to the upsetting of a verdict when there is a reasonable probability that, had the evidence been disclosed to the defense in a timeous manner or had the trial court given the defense more time to digest it, the result of the proceeding would have been different. United States v. Bagley, 473 U.S. 667, 678 (1985). The events here cannot pass that screen. A review of the record leaves no doubt about defense counsel's ability to impeach Irizarry using other evidence, such as Irizarry's status as both a confessed drug dealer and a cooperating witness. The ability to mount an effective cross-examination often is of great significance in delayed disclosure cases involving impeachment evidence, see, e.g., United States v. Mooney, 315 F.3d 54, 64 (1st Cir. 2002), and we find it significant here.

Last — but far from least — the missing records were neither voluminous nor arcane, and defense counsel had roughly thirty-six hours in which to scrutinize them before he brought the matter to the forefront. The district court found that he had had sufficient opportunity to comprehend their significance and to consult with an expert if he had so desired. That supportable finding weighs heavily in favor of the court's decision that more time was unwarranted. See Saccoccia, 58 F.3d at 770 (considering "the amount of time previously available for preparation and how assiduously the movant used that time"). So too does the fact that

defense counsel refused the court's invitation to recall Irizarry for further cross-examination. Given the totality of the circumstances, we cannot say that the trial court abused its discretion in denying the appellant's request for a continuance.

## IV. THE VOUCHING CLAIM

Next, the appellant complains that the prosecutor was guilty of vouching for the government's witnesses. This complaint focuses on the following passages of the prosecutor's rebuttal argument:

● You think, and think about this. If they were all going to get up and make up a story, wouldn't it have been a better story? Couldn't have Joelle come in here and made it a better story? That every day he was at the point, I saw Julio come in with Paquito with all of the bags of heroin. Wouldn't that make a better story? Couldn't Nazario have said: I saw Paquito, Goyito. I saw Goyito; I saw the money being passed.

● [I]f Goyito has nothing to do with Paquito and his group, why would he participate in the killing of Saul Perez? Let's go over this, Joelle is in prison, and he doesn't come out till 1999. Wouldn't it have been a better story to say that Goyito (spoke in Spanish), that he had shot Saul? Wouldn't that be a better story, wouldn't it, to put the gun in his hand?

Since the appellant's plaints are raised for the first time on appeal — he interposed no contemporaneous objections to these comments — our review is for plain error. Under that grueling standard, we can reverse only if the appellant demonstrates "(1) that an error occurred (2) which was clear or

-10-

obvious and which not only (3) affected the defendant's substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings."  United States v. Duarte, 246 F.3d 56, 60 (1st Cir. 2001).  We find no error here, plain or otherwise.

A prosecutor improperly vouches for a witness when she places the prestige of her office behind the government's case by, say, imparting her personal belief in a witness's veracity or implying that the jury should credit the prosecution's evidence simply because the government can be trusted.  See United States v. Figueroa-Encarnación, 343 F.3d 23, 28 (1st Cir. 2003).  Such tactics are not to be condoned.  They tilt the scales of justice, risk prejudicing the defendant, and carry the potential for distracting the jury from its assigned task of assessing credibility based solely on the evidence presented at trial and the demeanor of the witnesses.

We do not think that the statements by the prosecutor, quoted above, constituted vouching or were otherwise improper.  As this court explained in United States v. Rodríguez, 215 F.3d 110, 123 (1st Cir. 2000), "an argument that does no more than assert reasons why a witness ought to be accepted as truthful by the jury is not improper witness vouching."  Here, the prosecutor was merely asking the members of the jury to use their common sense in evaluating the witnesses' testimony.  She neither expressed her

-11-

personal opinion regarding the veracity of any witness nor implied that Irizarry should be trusted because of some connection to the government.

Moreover, the quoted statements were a logical counter to the assertions of defense counsel, made in summation, that various government witnesses had fabricated their testimony because they wanted the appellant behind bars and would stop at nothing to put him there. We typically cede prosecutors some latitude in responding to defense counsel's allegations of fabrication. See, e.g., United States v. Mejia-Lozano, 829 F.2d 268, 274 (1st Cir. 1987). How much leeway should be accorded may well depend on the circumstances (the prosecutor's statements would comprise an odd, and perhaps dubious, argument if there were no charge of fabrication or something of like nature). Even then, however, the statements — though possibly questionable on other grounds — would not amount to vouching.

There is dictum inimical to this view in United States v. Auch, 187 F.3d 125, 131-32 (1st Cir. 1999), which was embraced in United States v. Martínez-Medina, 279 F.3d 105, 119-20 (1st Cir. 2002). We disclaim that dictum. Auch, like United States v. Sullivan, 85 F.3d 743, 750-51 (1st Cir. 1996), rests on an understandable misreading of United States v. Manning, 23 F.3d 570, 572-73 (1st Cir. 1994). In Manning, this court condemned as vouching a passage containing a similar argument — that a detective

-12-

who testified for the prosecution would have told a more damaging story had he been prone to fabricate — but the vouching label was in fact directed only to the prosecutor's tail-end assertion that government witnesses do not lie. <u>Id.</u> at 572. Because the characterizations contained in <u>Auch</u> and <u>Martínez-Medina</u> are dictum, this panel is not obliged to adhere to them. <u>See</u> <u>Kosereis</u> v. <u>Rhode Island</u>, 331 F.3d 207, 213 (1st Cir. 2003). We are at liberty to correct the misunderstanding and now do so. Those statements are not good law.

## V.  MISCELLANEOUS EVIDENTIARY RULINGS

The appellant assigns error to a host of evidentiary rulings. For the most part, we review a trial court's rulings admitting or excluding evidence for abuse of discretion. <u>Gomez</u> v. <u>Rivera Rodriguez</u>, 344 F.3d 103, 114 (1st Cir. 2003); <u>Pendleton</u> v. <u>City of Haverhill</u>, 156 F.3d 57, 64 (1st Cir. 1998). This deferential standard is not appellant-friendly. Here, moreover, most of the disputed evidentiary rulings were not the subject of contemporaneous objections at trial. Because those assigned errors were not properly preserved, they face the even higher hurdle of plain error review. <u>See</u> <u>Duarte</u>, 246 F.3d at 60 (describing the methodology of plain error review). All the appellant's evidentiary claims fail under one or the other of these tests. Only two of them require comment.

The appellant's contention that the district court improperly denied him an opportunity to recross-examine police officer Jorge Nazario implicates the Confrontation Clause. U.S. Const. amend. VI. In the first instance, Confrontation Clause challenges are reviewed de novo in order to verify that the trial court afforded the defendant a reasonable opportunity to impeach adverse witnesses. When that constitutional threshold is crossed, we examine the trial court's restrictions on the manner and extent of cross-examination for abuse of discretion. See United States v. Balsam, 203 F.3d 72, 87 (1st Cir. 2000); United States v. Gomes, 177 F.3d 76, 80-81 (1st Cir. 1999).

It is crystal clear that the district court afforded the appellant ample opportunity to confront Officer Nazario's testimony about the Perez murder. It granted defense counsel a recess after the conclusion of direct examination and did nothing to limit the length of what proved to be a protracted (and skillfully conducted) cross-examination. We need only ask, therefore, whether the denial of recross-examination constituted an abuse of discretion. See Balsam, 203 F.3d at 87. We conclude that it did not.

We need not tarry. The district court cited a valid concern — the lack of new information on redirect — as the main reason for its prohibition of recross-examination, and the record attests to the accuracy of the court's perception. To cinch matters, the prospect of redundancy was confirmed when the court,

-14-

in an abundance of caution, allowed counsel to expound on the line of questioning that he wished to pursue. Under the circumstances of this case, there is no principled way that we can characterize the denial of recross-examination as an abuse of discretion. After all, a trial judge surely may limit cross-examination that will be merely cumulative. See Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986) (recognizing that trial judges retain wide latitude to impose reasonable limits on cross-examination "that is repetitive or only marginally relevant"); United States v. Boylan, 898 F.2d 230, 254 (1st Cir. 1990) (affirming trial judges' prerogative to set appropriate boundaries so that litigants do not "run roughshod" during cross-examination).

We also single out the appellant's objection to testimony about a hearsay statement of an alleged coconspirator. During direct examination, Irizarry testified that the appellant had shot Jessi Quinones-Torres in the arm because of a longstanding drug-related dispute. When asked how he knew this, Irizarry responded that Quinones-Torres had told him about the incident. At this point, the appellant raised a hearsay objection. Since the evidence showed that Quinones-Torres was operating a drug point within the scope of the master conspiracy, the district court overruled the objection and provisionally admitted the statement under Fed. R. Evid. 801(d)(2)(E).

Evidence Rule 801(d)(2)(E) allows the introduction of a statement made "by a coconspirator of a party during the course and in furtherance of the conspiracy."  When the government proffers such evidence in a criminal case, it bears the burden of establishing, by a preponderance of the evidence, "that a conspiracy embracing both the declarant and the defendant existed, and that the declarant uttered the statement during and in furtherance of the conspiracy."  Sepulveda, 15 F.3d at 1180.  "If these conditions are met and if there is corroboration in the form of extrinsic evidence of the declarant's involvement in the conspiracy, then the hearsay barrier is avoided and the statement may be admitted."  United States v. Bradshaw, 281 F.3d 278, 283 (1st Cir. 2002).

> In Bradshaw, we noted that:
>
> This court has constructed a model for the handling of evidence proffered under Rule 801(d)(2)(E).  That model authorizes the trial court to admit conditionally alleged coconspirator statements.  At the close of all the evidence, the court then makes a final determination as to the admissibility of the evidence.  If the court ultimately concludes that the provisionally admitted evidence does not satisfy the applicable standard, it must give a cautionary instruction to the jury, or, upon an appropriate motion, declare a mistrial if the instruction will not suffice to cure any prejudice.

Id. (citations and internal quotation marks omitted).  The trial court's final determination is known in this circuit as a

Petrozziello determination. See United States v. Petrozziello, 548 F.2d 20, 23 (1st Cir. 1977).

The appellant asserts that he interposed an objection to the challenged testimony. That is true as far as it goes — but it does not take him very far. The appellant neglected to renew this objection at the close of all the evidence so as to obtain a Petrozziello determination. That step is plainly required under our precedents. See, e.g., United States v. Newton, 326 F.3d 253, 257 (1st Cir. 2003) (holding that preservation of a hearsay objection to the admission of a coconspirator's statement necessitates renewing the objection at the close of the evidence); United States v. Woods, 210 F.3d 70, 78 (1st Cir. 2000) (same). Thus, we review the admission of the challenged statement only for plain error. Woods, 210 F.3d at 78. We descry none here.

## VI.  THE BOLSTERING CLAIM

The appellant maintains that the prosecution improperly bolstered Irizarry's credibility when Ivan Lugo, an agent of the Drug Enforcement Administration (DEA), testified as to both Irizarry's confirmed reliability as an informant in an unrelated investigation (involving the Tibes housing project gang) and the methods that he (Lugo) employed to corroborate Irizarry's out-of-court statements regarding the murder of Saul Perez. Because the parties disagree as to the appropriate standard of review, we start there.

To preserve a claim of error in the admission of testimony, a party ordinarily must interpose a contemporaneous objection to the question posed. See Fed. R. Evid. 103(a). But lawyers are not required to be prescient. Consequently, they are not required to object to proper questions in anticipation of unresponsive or otherwise inappropriate answers. 21 Charles A. Wright et al., Federal Practice and Procedure § 5037, at 187 (1st ed. 1977 & Supp. 2003) (collecting cases). When a proper question elicits an untoward reply, the failure to object to the question is excused so long as the aggrieved party promptly moves to strike the offending answer. See id. at 188-90.

On direct examination, Lugo testified that he had attempted to corroborate most of the information provided by Irizarry about the Tibes gang. Immediately after Lugo made this statement, defense counsel lodged a bolstering objection. The court correctly overruled the belated objection — both the question ("I ask you, after learning that information [about the existence of several gangs], what, if anything, did you do?") and Lugo's carefully circumscribed answer were proper.

Lugo's subsequent testimony was considerably more problematic. Among other things, he professed his belief in the accuracy of Irizarry's statements about the Tibes gang and vouchsafed that there were "several other witnesses, several other cooperating sources" who could corroborate Irizarry's testimony

-18-

linking the appellant to La Cabra's organization. But the appellant neither interposed any further objection nor moved to strike these answers. Hence, our review is for plain error.

The impropriety of the last-mentioned testimony is readily apparent. It is black-letter law that "prosecutors may not place the prestige of the United States behind a witness by making personal assurances about the credibility of a witness or by indicating that facts not before the jury support the witness's testimony." United States v. Rosario-Diaz, 202 F.3d 54, 65 (1st Cir. 2000) (citing United States v. Neal, 36 F.3d 1190, 1207-08 (1st Cir. 1994)). It follows inexorably that the prosecution cannot prop up a dubious witness by having a government agent place the stature of his office behind the witness. Id. Although the prosecution's success often depends on its ability to convince the jury of a particular witness's credibility, it cannot entice the jury to find guilt on the basis of a DEA agent's opinion of the witness's veracity.

Lugo's testimony constitutes a flagrant breach of these standards. It invited the jury to give weight to his belief that Irizarry had told the truth during the investigation of the Tibes gang. Equally as improper was Lugo's ipse dixit that "several other witnesses" — none of whom were identified — had purportedly corroborated Irizarry's testimony about the appellant's involvement in Saul Perez's murder. In these ways, Lugo placed the prestige of

-19-

his lengthy government service behind Irizarry's statements. Furthermore, the reliance on "evidence" not before the jury constituted an independent (and even more serious) lapse. See Balsam, 203 F.3d at 88 (condemning a prosecutor's reliance on facts outside the record to support a prosecution witness). The challenged testimony was improper and never should have seen the light of day. See, e.g., United States v. Martinez, 253 F.3d 251, 253-54 (6th Cir. 2001); Rosario-Diaz, 202 F.3d at 65-66. To make a bad situation worse, this hardly seems to be an innocent lapse. Lugo was a veteran DEA agent and had an obvious interest in bolstering Irizarry's credibility.

Having found improper bolstering, we apply the test for plain error. See Duarte, 246 F.3d at 60-62. The first two requirements are easily satisfied: it was error of the most glaring sort to place the challenged testimony before the jurors. We proceed, then, to the third and fourth steps of the plain error pavane.

The appellant emphasizes that Irizarry's credibility was very important to the case against him and claims, on that basis, that Lugo's ill-conceived testimony affected his substantial rights. This claim fails for two principal reasons.

First, Irizarry's testimony was scarcely the sine qua non of the government's case. The jury may well have based its verdict on Officer Nazario's testimony. Nazario stated that he observed

the appellant exchanging money with people on the street and consorting with both Paquito — a confirmed member of the La Cabra conspiracy — and Irizarry.  Moreover, Nazario testified that he had learned first-hand of the appellant's leadership position in the drug conspiracy when the appellant apologized on behalf of an underling who had left a used syringe in Nazario's backyard.  This testimony, in combination with other evidence, was potent enough to prove the government's case.

Second, and perhaps more critical to our analysis, Lugo's improper bolstering appears to have played a very modest role in the unfolding drama of the trial.  The prosecutor wisely refrained from referring to that testimony during closing arguments and reminded the jurors several times that it was their responsibility to assess the credibility of the witnesses.  The district court's instructions sounded a similar theme.  Viewed in this light, we conclude that Lugo's bolstering, while deserving of reproof, did not affect the appellant's substantial rights.  Consequently, the incident does not require vacation of the conviction.

## VII.  THE APPRENDI CLAIM

While the appellant's multi-pronged attack on his conviction fails, his assault on his sentence has more bite.  His main argument is that the district court neglected to submit critical questions involving drug type and quantity to the jury as required by Apprendi, 530 U.S. at 490.

We begin this phase of our analysis with a preliminary question concerning the standard of review. The government argues that plain error review is appropriate because the appellant neither objected to the jury instructions (which omitted any meaningful reference to drug type and quantity) nor requested a special verdict form (which presumably would have required the jury to determine drug type and quantity). The problem with this argument is that it imputes to the defendant a nonexistent duty. A party's obligation to object to an erroneous jury instruction endures only to the extent that the instruction is inimical to his cause. By like token, a party's obligation to object to the court's eschewal of a special verdict form endures only to the extent that the omission is inimical to his cause. The appellant had no interest in ensuring his eligibility for a longer sentence, and, thus, had no obligation to object here. In order to preserve a claim of Apprendi error for appeal, it is enough that a defendant offer a timely objection at sentencing to the imposition or proposed imposition of a term that exceeds the applicable statutory maximum. See United States v. Nelson-Rodriguez, 319 F.3d 12, 47 (1st Cir. 2003).

The appellant fulfilled this prerequisite. He broached the Apprendi issue in his objections to the presentence investigation report (PSI Report) and renewed those objections during the disposition hearing. Consequently, the Apprendi claim

-22-

was fully preserved and we will review it under the usual standard. Plain error is not the benchmark here.

We turn next to the district court's sentencing determination. The record makes manifest the district court's reliance on the PSI Report. That report identified 21 U.S.C. § 841(b)(1)(A), which sets the maximum available punishment at life imprisonment, as the relevant penalty provision.[1] The district court proceeded to apply the murder cross-reference, USSG §2D1.1(d)(1), to arrive at a base offense level of 43. It then determined that the appellant had assumed a supervisory role in the charged conspiracy and added two levels. See id. §3B1.1(c). Based on this total offense level (45) and the appellant's prior criminal record (which placed him in criminal history category II), life imprisonment became the only available sentencing option. See id. Ch.5, Pt.A (sentencing table). The court imposed sentence accordingly. Beyond the language of the indictment and the choice of the applicable penalty provision, see supra note 1, there is nothing in the record to suggest that the court made any independent findings regarding the drug types and quantities attributable either to the conspiracy as a whole or to the appellant.

---

[1]That statute enumerates the penalties for, inter alia, the distribution of one or more kilograms of heroin, five or more kilograms of cocaine, and 50 or more grams of cocaine base. The superseding indictment alleged the distribution of these same amounts.

This methodology gives us pause. Apprendi's core principle is that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490. Apprendi does not prohibit a sentencing court from making factual findings that increase a defendant's sentence (including findings as to drug type and quantity) as long as the sentence imposed is within the default statutory maximum. See United States v. Caba, 241 F.3d 98, 101 (1st Cir. 2001). Nevertheless, drug type and quantity must be determined by the jury before a defendant may receive a sentence in excess of the default statutory maximum. Martínez-Medina, 279 F.3d at 121-22.

In this case, the district court's determination that the default statutory maximum encompassed life imprisonment removed Apprendi from the decisional calculus. But that determination depended upon the court's choice of 21 U.S.C. § 841(b)(1)(A) as the applicable penalty provision (and, thus, the source of the statutory maximum). This would have been a correct choice had the jury found that the charged conspiracy involved the drug quantities listed in that statutory provision and charged in the indictment — but the jury made no such finding.

Where, as here, a defendant is accused of distributing heroin, cocaine, and cocaine base in violation of 21 U.S.C. §

-24-

841(a), the default statutory maximum derives from 21 U.S.C. §
841(b)(1)(C).  See United States v. LaFreniere, 236 F.3d 41, 49
(1st Cir. 2001) (explaining that the catchall provision of section
841(b)(1)(C) contains the correct statutory maximum for substances
classified under Schedules I and II).  That makes the default
statutory maximum 20 years.[2]  See United States v. Robinson, 241
F.3d 115, 118 (1st Cir. 2001).  For this case to have triggered a
higher statutory maximum, the jury would have had to have found,
beyond a reasonable doubt, that the conspiracy was responsible for
the distribution of drugs in amounts at least equal to the
quantities described in 21 U.S.C. § 841(b)(1)(B) (e.g., 100 grams
of heroin, 500 grams of cocaine, or five grams of cocaine base).
And for the case to have triggered a statutory maximum extending to
life imprisonment, the jury would have had to have found, beyond a
reasonable doubt, that the conspiracy was responsible for the
distribution of drugs in amounts at least equal to the quantities
described in 21 U.S.C. § 841(b)(1)(A) (e.g., one kilogram of
heroin, five kilograms of cocaine, or 50 grams of cocaine base).

The jury's findings would be readily ascertainable if the
court had required it to complete and return a special verdict

---

[2]Citing 21 U.S.C. § 841(b)(1)(D), the appellant urges us to
find that the default statutory maximum for purposes of this case
is five years.  He is wrong:  that is the default statutory maximum
for offenses involving marijuana.  See Derman v. United States, 298
F.3d 34, 42 (1st Cir. 2002).  Here, however, the superseding
indictment accused the appellant of conspiring to distribute
heroin, cocaine, and cocaine base — not marijuana.

form.  See, e.g., United States v. Knight, 342 F.3d 697, 709 (7th Cir. 2003).  Here, however, the government did not suggest such a course and no detailed questions were submitted to the jury.  We must therefore examine the indictment and jury instructions to ascertain what findings can be ascribed to the jury.  See, e.g., Soto-Beníquez, ___ F.3d at ___ [slip op. at 83-84]; Nelson-Rodríguez, 319 F.3d at 45.

The superseding indictment charged in pertinent part that the appellant and his coconspirators

> did, knowingly and intentionally, combine, conspire, and agree with each other and with divers other persons to the grand jury known and unknown, to commit an offense against the United States, to wit, to knowingly and intentionally distribute multi-kilogram quantities of controlled substances, that is to say, in excess of one (1) kilogram of heroin, a Schedule I Narcotic Drug Controlled Substance, in excess of five (5) kilograms of cocaine, a Schedule II Narcotic Drug Controlled Substance, in excess of fifty (50) grams of cocaine base, a Schedule II Narcotic Drug Controlled Substance, as prohibited by Title 21, United States Code, Section 841(a)(1).

By specifying drug types and quantities, the indictment laid the appropriate groundwork; it put the appellant on notice that he could face a life sentence.  Without more, however, the language of the indictment does not evince that the jury, by the naked act of returning a guilty verdict, actually found the appellant responsible for the described drug types and quantities.  The jury instructions must supply a proper linkage.  See United States v.

Westmoreland, 240 F.3d 618, 633 (7th Cir. 2001) ("Apprendi requires drug quantity — when it subjects a defendant to an enhanced sentence — to be both charged in the indictment and submitted to the jury.").

The jury instructions in this case did not supply that linkage. They did not advise the jury that it must find the defendant guilty beyond a reasonable doubt of conspiracy to distribute, at a minimum, the drug types and quantities described in the indictment. Indeed, the court only mentioned drug types and quantities once during its charge:

> Let's say something about the underlying crime, which is possession of narcotics with intent to distribute. In the indictment the charge regarding controlled substances is that this was a conspiracy to possess with intent to distribute in excess of one kilo of heroin, in excess of five kilos of cocaine, and in excess of 50 grams of cocaine base, all controlled substances under Schedule I or Schedule II of the federal law, in violation of Section 21 U.S. Code, Section 841(a)(1)(A)(1) [sic].

The government asserted at oral argument that this lone reference, coupled with an unrelated instruction (that in order to find the appellant guilty of conspiracy, the jury had to find beyond a reasonable doubt that "the agreement specified in the indictment . . . to possess with intent to distribute controlled substances" actually existed), made the general verdict tantamount to a sufficient jury finding of drug types and quantities. That is too much of a stretch. Notwithstanding the government's artful

-27-

cutting and pasting, the jury instructions, read as a whole, did not forge the necessary link: they omitted any connection between (a) drug types and quantities, and (b) the requirement that these facts be proven beyond a reasonable doubt. Absent either a special verdict form or a suitably focused jury instruction (requiring a finding beyond a reasonable doubt, that the appellant had knowingly participated in a conspiracy to distribute one kilogram or more of heroin, or five kilograms or more of cocaine, or 50 grams or more of cocaine base), the verdict did not cure the potential Apprendi problem. See Manual of Model Criminal Jury Instructions § 6.21.846A.1 at 490 (8th Cir. 2003) (explicating recommended jury instructions for "Apprendi-Affected Conspiracy"); cf. Knight, 342 F.3d at 709 (recognizing the need to modify pattern jury instructions for drug-trafficking cases in response to Apprendi). The boilerplate verdict sheet, which directed the jury to find the defendant guilty or not guilty "as charged in . . . the Indictment," did not rectify this omission. See Nelson-Rodriguez, 319 F.3d at 45. Nor did the fact that the court sent a copy of the indictment into the jury room. See Soto-Beníquez, ___ F.3d at ___ [slip op. at 83-84].

Because the issue of drug type and quantity was not properly submitted to the jury, the statutory maximum remained at 20 years. See 21 U.S.C. § 841(b)(1)(C). In sentencing the appellant to a term of imprisonment beyond that outer limit — life

— the district court committed an Apprendi error.  See United States v. Bailey, 270 F.3d 83, 88-89 (1st Cir. 2001).

The appellant argues, in his pro se supplemental brief, that this Apprendi error is structural (and, thus, automatically requires vacation of his sentence).  Cf. Vasquez v. Hillery, 474 U.S. 254, 263-64 (1986) (granting habeas relief because systematic exclusion of African-Americans from a grand jury constitutes structural error).  But the Apprendi error in this case — the failure to submit the necessary drug type and quantity questions to the jury — is not a structural error.  An Apprendi error is not a "defect affecting the framework within which the trial proceeds," but, rather, "simply an error in the trial process itself." Arizona v. Fulminante, 499 U.S. 279, 310 (1991); cf. Sepulveda v. United States, 330 F.3d 55, 60 (1st Cir. 2003) (declining to characterize Apprendi as a watershed rule of criminal procedure for retroactivity purposes).  Accordingly, we join several of our sister circuits in holding that the failure to submit appropriate drug type and quantity questions to the jury does not constitute structural error.  See United States v. McDonald, 336 F.3d 734, 738 (8th Cir. 2003); United States v. Stewart, 306 F.3d 295, 319-23 (6th Cir. 2002); United States v. Carter, 300 F.3d 415, 428 (4th Cir. 2002) (per curiam); United States v. Adkins, 274 F.3d 444, 454 (7th Cir. 2001); United States v. Vazquez, 271 F.3d 93, 103 (3d

Cir. 2001); <u>United States</u> v. <u>Smith</u>, 240 F.3d 927, 930 (11th Cir. 2001).

We turn next to the government's averment that the sentence may stand because the <u>Apprendi</u> error did not affect the appellant's substantial rights. This is a harmless error argument, <u>see</u> Fed. R. Crim. P. 52(a), and the nature of the error determines the appropriate test for harmlessness.

In the case of most non-structural errors, an error is harmless (and, thus, does not affect substantial rights) if it can be said with fair assurance that the error did not have a substantial and injurious effect upon the verdict. <u>See</u> <u>Kotteakos</u> v. <u>United States</u>, 328 U.S. 750, 764-65, 776 (1946); <u>United States</u> v. <u>Ladd</u>, 885 F.2d 954, 957 (1st Cir. 1989). A different test applies, however, when a non-structural error is of constitutional dimension. In that event, the government must prove that the error was harmless beyond a reasonable doubt, or, put another way, that it can fairly be said beyond any reasonable doubt that the assigned error did not contribute to the result of which the appellant complains. <u>Neder</u> v. <u>United States</u>, 527 U.S. 1, 15 (1999); <u>Chapman</u> v. <u>California</u>, 386 U.S. 18, 24 (1967). An <u>Apprendi</u> error is of constitutional magnitude. <u>See</u> <u>United States</u> v. <u>Nealy</u>, 232 F.3d 825, 829-30 (11th Cir. 2000). Hence, we use the latter standard here.

It is against this backdrop that we undertake whole-record review. We pause first, however, to complete the legal framework. Although it is true that we require a defendant-specific determination of drug quantity as a benchmark for individualized sentencing under the guidelines, see United States v. Bradley, 917 F.2d 601, 604 (1st Cir. 1990); USSG §1B1.3, the statutory maximum in a drug conspiracy case derives from a conspiracy-wide perspective:

> [A] judge lawfully may determine the drug quantity attributable to [a particular] defendant and sentence him accordingly (so long as the sentence falls within the statutory maximum made applicable by the jury's conspiracy-wide drug quantity determination).

Derman v. United States, 298 F.3d 34, 43 (1st Cir. 2002); accord Soto-Beníquez, ___ F.3d at ___ [slip op. at 89]; Nelson-Rodriguez, 319 F.3d at 46; see also United States v. Cotton, 535 U.S. 625, 633-34 (2002) (finding no plain error based on the Court's appraisal of "[t]he evidence that the conspiracy involved at least 50 grams of cocaine base") (emphasis supplied). In drug-trafficking cases involving Apprendi errors, we sometimes have treated the presence of "overwhelming evidence" of the requisite drug types and quantities as a proxy for harmlessness. See Soto-Beníquez, ___ F.3d at ___ [slip op. at 86]; Nelson-Rodriguez, 319 F.3d at 45-49; Bailey, 270 F.3d at 89. Under that formulation, an error involving the failure to submit appropriate drug type and

quantity questions to the jury can be viewed as harmless if overwhelming evidence adduced at trial shows that, during the time frame described in the indictment, the conspiracy encompassed types and quantities of drugs sufficient to trigger a statutory maximum equal to or above the sentence actually imposed on the individual defendant.[3]  In this case, then, the government has the burden of showing harmlessness by pointing to overwhelming evidence that the charged conspiracy distributed a minimum of one kilogram of heroin, five kilograms of cocaine, or 50 grams of cocaine base (the alternative quantities described in 21 U.S.C. § 841(b)(1)(A)).

The evidence here permits a reasonable inference that the charged conspiracy engaged in large-scale drug trafficking.  But the government did not focus on the quantity issue and seems to have dealt mainly in generalities.  Given the tenuous nature of the proof of drug weights, it would strain credulity to characterize as "overwhelming" the evidence of drug quantity attributable to the conspiracy as a whole.

As conceded by the government at oral argument, there were only three times during the trial when actual drug quantities were mentioned.  First, Irizarry testified that in the fall of 1998

---

[3]This rule applies in routine drug-trafficking cases (like the case at hand).  Cases in which the government has charged either "death or serious bodily injury result[ing] from the use of [a controlled substance]" or commission of the offense of conviction "after a prior conviction for a felony drug offense has become final," 21 U.S.C. § 841(b)(1), must be examined according to a somewhat different paradigm.

he bought "a quarter" of cocaine in Caguas for the appellant. Second, Frankie Pietri Sepulveda testified that in the mid-1990s he supplied La Cabra with "two or three or four kilos" of cocaine on "several" occasions, amounting to a total of "more than 15" kilograms of cocaine. Third, Lugo estimated, without elaboration, that the drug ring distributed "over 150 kilograms of cocaine, over 1.5 kilograms of crack cocaine, and over a kilogram of heroin."

These references leave much to be desired. Irizarry's colloquial description fails to specify an actual drug weight, and it could be argued that Sepulveda's testimony is off point because La Cabra may have used the described cocaine for purposes other than to fuel the charged conspiracy. That leaves Lugo's testimony. We do not believe that it can carry the day: Lugo failed to provide any factual basis for his estimate and that omission dilutes its probative value.

We have refused in the past to place blind reliance on conclusory statements of drug quantity similar to Lugo's estimate, see, e.g., United States v. Rivera-Maldonado, 194 F.3d 224, 228-30, 233 (1st Cir. 1999), and we see no reason to discard that cautious policy today. Although lack of detail generally goes only to weight, it is highly pertinent to a harmless error analysis — and we are entitled to be chary about making a Chapman determination based solely on the conclusory testimony of a non-participant. If the government expects its witnesses' conclusions to be taken as

strongly probative, the least that it can do is to elicit a sufficient factual foundation to support those conclusions.

These slim evidentiary pickings place this case at a considerable remove from the cases in which courts have found overwhelming evidence of drug type and quantity. Unlike most of those cases, the instant case did not include testimony describing quantities of drugs actually seized from coconspirators. See, e.g., Knight, 342 F.3d at 712; United States v. Mendoza-Gonzalez, 318 F.3d 663, 674 (5th Cir. 2003); United States v. Anderson, 236 F.3d 427, 429-30 (8th Cir. 2001) (per curiam). Nor was this a case in which the evidence tying the defendant to the charged conspiracy involved drugs that were indisputably in excess of the requisite amounts. See, e.g., Soto-Beníquez, ___ F.3d at ___ [slip op. at 88]; Nelson-Rodriguez, 319 F.3d at 48-51.

To be sure, the sketchiness of the evidence of drug type and quantity does not undermine the conviction: the jury appropriately could have found the appellant guilty of participating in the charged conspiracy, with or without finding that the venture involved trafficking on the scale required to trigger the penalty provisions of 21 U.S.C. § 841(b)(1)(A). But that is scant comfort for a Chapman harmlessness analysis. Even though the evidence, taken in the light most favorable to the government, would be enough to sustain a jury finding of the threshold amounts, more is required to show harmlessness beyond a

reasonable doubt. Concluding, on this exiguous record, that the proof constituted overwhelming evidence of the necessary threshold amounts would be unreasonable. See Bailey, 270 F.3d at 89-90.

That ends our inquiry. Because the government has failed to carry its burden of establishing that the Apprendi error was harmless beyond a reasonable doubt, we vacate the appellant's sentence and remand for resentencing within the parameters of 21 U.S.C. § 841(b)(1)(C). Even if the district court still sees fit to apply the murder cross-reference found in USSG §2D1.1(d)(1) — a matter on which we take no view[4] — it may not increase the term of imprisonment beyond a maximum of 20 years. See USSG §5G1.1(a) ("Where the statutorily authorized maximum sentence is less than the minimum of the applicable guideline range, the statutorily authorized maximum sentence shall be the guideline sentence.").

---

[4]We mention this cross-reference for a reason. While our resolution of the Apprendi issue renders it unnecessary for us to rule on the remainder of the appellant's sentencing arguments, we note that the district court failed to respond to an issue that the appellant raised in his objections to the PSI Report vis-à-vis his alleged involvement in the Perez murder. This failure to address the appellant's objection was error. See Fed. R. Crim. P. 32(i)(3)(B). The court then proceeded to apply the murder cross-reference without making an explicit finding (though perhaps one might be implied) that the government had shown by a preponderance of the evidence that the appellant bore responsibility for the slaying. If, on remand, the sentencing court again chooses to apply the cross-reference, it should take care to make a more complete record of the basis for doing so.

**VIII.  CONCLUSION**

We need go no further.  For the reasons elucidated above, we affirm the appellant's conviction, vacate his sentence, and remand for further proceedings consistent with this opinion.

**<u>Affirmed in part, vacated in part, and remanded</u>**.